UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

**FIRST NATIONAL BANK OF JEANERETTE**     \*CIVIL NO. 08-0913

**VERSUS**                                 \*JUDGE DOHERTY

**LAWYERS TITLE INSURANCE CORP.**          \*MAGISTRATE JUDGE HILL

<u>REPORT AND RECOMMENDATION
ON MOTION FOR SUMMARY JUDGMENT</u>

Pending before the undersigned for Report and Recommendation is the Motion for Summary Judgment filed by defendant, Lawyers Title Insurance Corporation ("Lawyers Title"), on May 24, 2010 [rec. doc. 36]. On July 15, 2010, the undersigned held oral argument on the motion, after which I took it under advisement. For the following reasons, I recommend that the motion be **GRANTED**.

*Background*

In July, 2007, Lynden and Lucretia Burton (the "Burtons") applied to First National Bank of Jeanerette ("FNB") for a mortgage to purchase a home in New Iberia, Louisiana. In their application, the Burtons represented that they did not have any liens against them. [rec. doc. 36, Exhibit A, p. 3]. This was untrue; a federal income tax lien dated September, 2003, in the amount of $165,645.68 had been filed against the Burtons and recorded in the Iberia Parish mortgage records on September 16, 2003. [rec. doc. 36, Exhibit B].

FNB processed the Burtons' application using the "Fannie Mae Desktop Underwriter" software to determine their qualifications for the loan and whether the loan would be eligible to be sold to a third-party. [rec. doc. 36, Exhibit C, pp. 32-33]. A mortgage credit report dated July 11, 2007, revealed the federal tax lien against the Burtons. [rec. doc. 36, Exhibit C, pp. 47-48; Exhibit E, p. 6]. Additionally, a Fannie Mae Underwritings Findings Report dated September 17, 2007 reflected the Burtons' federal tax lien, and indicated Fannie Mae's requirement that the lien "must be paid prior to or at closing and funds sufficient to settle the accounts must be verified." [rec. doc. 36, Exhibit D, p. 2]. The date satisfied/date released was noted as "Unknown." Further, on August 16, 2007 a credit report obtained by FNB reflected the Burtons' federal tax lien. [rec. doc. 36, Exhibit F].

FNB admitted that, as of the date of the first credit report, July 17, 2007, it was on notice that the Burtons had a federal tax lien filed against them [rec. doc. 36, Exhibit C, pp. 40-41; Exhibit M, responses to Interrogatories 9 and 16].

As a condition of financing, FNB required lender's title insurance. Lawyers Title issued a commitment for title insurance to FNB reflecting an effective date of September 13, 2007. [rec. doc. 36, Exhibit J]. On the day of the closing, September 18, 2007, Lawyers Title issued a Short Form Residential Loan Policy of title insurance to FNB. [rec. doc. 36, Exhibit K]. The tax lien was not shown on the commitment letter or the policy.[1] At closing on September 18, 2007, the Burtons signed a final loan application, in which they represented that they were not delinquent or on default on any federal debt. [rec. doc. 36, Exhibit I, p. 4]. FNB never notified

---

[1] The lien was missed by the lawyer who issued the policy.

Lawyers Title about the tax lien before closing, and never checked to confirm it had been paid. [rec. doc. 36, Exhibit C. p. 96].

FNB had issued the financing to the Burtons with the intent to sell the mortgage to a third party, The Independent BankersBank ("TIB"). On October 30, 2007, TIB informed FNB that it could not purchase the loan because of the Burtons' federal tax lien. [rec. doc. 36, Exhibit L]. TIB explained that Fannie Mae required payoff of all liens listed on the Underwriting Findings report before closing.

The principal amount of the Burtons' loan was $301,500.00; the interest rate is fixed at 8.375%. [rec. doc. 36, Exhibit C, p. 100]. The Burtons paid FNB an origination fee of $3,015.00. [rec. doc. 36, Exhibit C, pp. 112-13; Exhibit O]. As of May, 2010, the Burtons have paid a total of $71,040.22 in principal and interest to FNB, $64,579.49 of which are interest payments. [rec. doc. 36, Exhibit N]. The Burtons are up-to-date on their mortgage payments to FNB.

On June 5, 2008, FNB filed suit for damages against Lawyers Title in the 16th Judicial District Court, Parish of Iberia, State of Louisiana. Specifically, FNB's claims were for breach of contract and detrimental reliance based on its inability to sell the loan to TIB. [rec. doc. 18]. Lawyers Title removed the action to this court on June 27, 2008 on the basis of diversity jurisdiction.

On May 24, 2010, Lawyers Title filed a Motion for Summary Judgment on FNB's breach of contract and detrimental reliance claims. [rec. doc. 36]. FNB filed opposition on

June 14, 2010. [rec. doc. 38]. On July 15, 2010, the undersigned held oral argument on the motion, after which I took the motion under advisement.

## *Summary Judgment Standard*

Fed.R.Civ.Proc. 56(c)(2) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(e)(2) provides, in pertinent part, as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

## *Analysis*

### 1. Breach of Contract Claim

First, Lawyers Title asserts that FNB's breach of contract claim must be dismissed because it cannot prove the elements necessary to establish it's claim.

In this *Erie* case, the law of Louisiana applies.[2] Louisiana law provides that an insurance policy is a contract between the parties and should be construed using the general rules of contract interpretation set forth in the Louisiana Civil Code. *First American Bank v. First American Transp. Title Ins. Co.*, 585 F.3d 833, 837 (5th Cir. 2009). The words used in an

---

[2]*Foradori v. Harris,* 523 F.3d 477, 486 (5th Cir. 2008) ("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law") (*citing Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78-79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

insurance policy must be given their generally prevailing meaning. *Id*. When the language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation. *Id*.

Here, the policy provides that it is a "contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured claimant who has suffered loss or damage by reason of matters insured against by this policy." [rec. doc. 36, Exhibit K, p. 6, provision 7]. "Indemnity" is defined as reimbursement and "indemnification" as the action of compensating for loss or damage sustained. *Ciliberti v. Mistretta*, 2003-1559 (La. App. 1 Cir. 5/14/04); 879 So.2d 789, 793 n. 2; *Life Investors, Ins. Co. of America v. John R. Young Chevrolet, Inc*., 1998-1562 (La. App. 3 Cir. 3/3/99); 730 So.2d 519, 523. Although FNB argued at the hearing that the title insurance policy was not an indemnity contract, the express language of the policy quoted above provides otherwise.

FNB claims that Lawyers Title breached the following provision of the policy:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, LAWYERS TITLE INSURANCE CORPORATION, a Virginia corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

\*          \*          \*

2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title.

[rec. doc. 36, Exhibit K, p. 4].

However, the policy also contains the following exclusion:

The following matters are expressly *excluded* from coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

          *          *          *

3.     Defects, liens, encumbrances, adverse claims or other matters:

          *          *          *

     (c)     resulting in no loss or damage to the insured claimant.

(emphasis added) [rec. doc. 36, Exhibit K].

Lawyers title argues that because FNB has sustained no actual loss, it is not entitled to coverage under the indemnity policy. The undersigned agrees that FNB has not suffered an actual loss. In fact FNB has *profited* from the loan, as the Burtons paid $3015.00 to FNB as an origination fee and have, as of May 2010, paid FNB $64,579.49 in interest. Further, the Burtons are current on all mortgage payments and have made $6,460.73 in principal payments to FNB. Because the policy covers only actual losses and damages, and since FNB has sustained no such loss, it cannot recover for breach of that contract.

FNB argues that had it sold the Burton mortgage to TIB, it would have collected a service fee of $5,701.47 on the sale. This, FNB argues, is a "loss" under the policy. Additionally FNB argues that since it is not in the business of servicing this type of fixed-rate loan, it has to do so manually, which, FNB asserts, is a loss. [rec. doc. 38, p. 6 – 7].

FNB's argument ignores the plain language of the policy quoted above. A contract of "indemnity" insures only against "actual monetary loss." FNB has sustained no "monetary loss". Obviously, the clerical duties performed in the bookkeeping functions of servicing the loan is not an "actual monetary loss". The failure to collect the service fee is not a monetary loss to FNB, as that term is used in this indemnity policy. At best, FNB has lost the opportunity to profit by collecting this fee; FNB did not, however, lose capital, or sustain an actual loss of money. In fact, FNB has profited by over $60,000 to date.

The Court's conclusion is supported by the Court's reasoning and decision in *First Merit Bank, NA v. Guarantee Title & Trust Co.*, L 1791148, 4 -5 (Ohio App. 9 Dist., 2006). In reaching the same conclusion as does the undersigned, on the same policy language, the court noted as follows:

> Pursuant to the Lender's Policy, . . . [t]he policy's Conditions and Stipulations section describes the insurer's determination and extent of liability in paragraph 7 as "a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy." Pursuant to this provision, Appellant contends that its liability is limited to indemnifying Appellee for losses related only to claims asserted against the title by third parties.
>
>    *      *      *
>
> "The principle that title insurance is a contract of indemnity, not a guaranty of the state of title, is not only inherent in the policy here but is recognized generally by the courts in cases involving both the owner's and the mortgagee's title insurance. * * * To trigger the duty to indemnify, the insured must have a claim asserted against the title by a third party because an 'indemnity is a * * * collateral promise to make good a loss or injury suffered by a policyholder in consequence of the act of a third party.' The kind of loss contemplated by such policy is that loss or damage sustained when, 'because of a defect in the title, the insured was

bound to pay something to make it good." (internal citations omitted) (citation omitted)[3]

Additionally, Lawyers Title argues that FNB will not suffer any damages as a result of the tax lien because the mortgage remains a first-priority lien. Lawyer's Title is correct. It is well established that a security interest based on the extension of purchase money defeats a previously filed federal tax lien. *First Interstate Bank of Utah, N.A. v. I.R.S.*, 930 F.2d 1521, 1523 (10th Cir. 1991) (*citing Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)). A federal tax lien is subordinate to a purchase-money mortgagee's interest notwithstanding that the agreement is made and the security interest arises after notice of the tax lien. *Slodov*, 436 U.S. at 259, 98 S.Ct. at 1791, n. 23. Thus, under settled law, FNB has a first mortgage position and will not sustain any loss covered by the policy.

Finally, Lawyers Title further asserts that because FNB had actual knowledge of the tax lien before closing, and before issuance of the policy, FNB is not entitled to recover under the contract. The policy expressly provides as follows:

> The following matters are expressly excluded from coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
>
>         \*                  \*                  \*

---

[3] Obviously, this Court is not bound by this decision. The undersigned, however, agrees with the Court's reasoning, and can express the principle of law no better than did the Ohio court.

    3.    Defects, liens, encumbrances, adverse claims or other matters:

        \*        \*        \*

    (a)    *created, suffered, assumed or agreed to* by the insured claimant.

(emphasis added). [rec. doc. 36, Exhibit K, p. 4].

This type of exclusion bars coverage where there has been misconduct or inequitable behavior on the part of the lender, where the lender assumes or agrees to liens, or where the lender stands to receive an inequitable windfall if the insurer settles lien claims in order to protect the mortgage priority.[4] *Chicago Title Ins. Co. v. Resolution Trust Corp.*, 53 F.3d 899, 905 (8th Cir. 1995); *American Title Ins. C. v. East West Financial*, 16 F.3d 449, 455 (1st Cir. 1994).

Here, the evidence shows that FNB knew about the federal tax lien prior to closing. The mortgage credit report dated July 17, 2007, revealed the federal tax lien dated September, 2003 against the Burtons. [rec. doc. 36, Exhibit C, pp. 47-48; Exhibit E, p. 6]. Additionally, the Fannie Mae Underwritings Findings Report dated September 17, 2007 reflected the Burtons' federal tax lien dated September 1, 2003, and stated that the lien "must be paid prior to or at closing and funds sufficient to settle the accounts must be verified." [rec. doc. 36, Exhibit D, p.2]. Further, the August 16, 2007 credit report reflected the Burtons' federal tax lien. [rec. doc. 36, Exhibit F]. Moreover, FNB admitted that it was on notice that the Burtons had a

---

[4] If FNB's position is accepted, Lawyer's Title would pay FNB the current principal balance of the loan. [rec. doc. 38, p. 8]. However, FNB would keep the interest payments made to date, a clear windfall.

federal tax lien filed against them as of the date of the first credit report, July 17, 2007. [rec. doc. 36, Exhibit C, pp. 40-41; Exhibit M, responses to Interrogatories 9 and 16].  As FNB was aware of, and at least "suffered", the lien prior to the issuance of the title policy, the exclusion applies, and thus there is no coverage for FNB under the policy.

Accordingly, I recommend that the motion for summary judgment on the breach of contract claim be **GRANTED**.

**2. Detrimental Reliance Claim**

Next, Lawyers Title argues that it is entitled to summary judgment on the detrimental reliance claim.

Louisiana law provides that a party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was *reasonable* in so relying.  (emphasis added).  LA.CIV CODE art. 1967. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance.  *Suire v. Lafayette City-Parish Consol. Government*, 2004-1459 (La. 4/12/05); 907 So.2d 37, 59.  The doctrine of detrimental reliance is not favored by Louisiana law, and all claims must be examined strictly and carefully. *McPherson v. Cingular Wireless, L.L.C.*, 2007-0462 (La. App. 3 Cir. 10/3/07); 967 So.2d 573, 579.

Lawyers Title argues that because FNB had actual knowledge of the Burtons' lien prior to closing, FNB's reliance was not justifiable. "If the evidence reveals that the asserting party had actual knowledge, or a ready and convenient means of determining the facts concerning representations made, [detrimental reliance] will not lie.[5] *Miller v. Lowe*, 2009 WL 4730201 (W.D. La. Dec. 4, 2009) (*citing Knippers v. Dr. W.W. Lambard*, 620 So.2d 1368, 1374 (La. App. 2nd Cir. 1993).

The facts on this issue are clear and undisputed. FNB was repeatedly made aware of the tax lien, and, as acknowledged by FNB, was on notice of the lien. FNB argues that it was "reasonable" for FNB to ignore the implication of this knowledge because it relied on the absence of the tax lien on the title commitment letter issued by the attorney for lawyers title.

However, FNB cannot recover under the theory of detrimental reliance if it had actual knowledge of the lien. Here that knowledge has been admitted by FNB. Furthermore, all FNB had to do in order to determine the facts was to call the title lawyer, or re-check the credit reports. Of course, the tax lien remained on the public record had FNB bothered to check there.

In essence, FNB argues that under the doctrine of "detrimental reliance" it is entitled to ignore that of which it had actual knowledge, the tax lien. FNB fails to cite a single case that extends the doctrine of detrimental reliance this far. The undersigned has failed to find any such case. Since there is no decision of the Louisiana Supreme Court on point, this Court must determine, as best it can, what the Louisiana Supreme Court would decide on this issue.

---

[5] The elements of detrimental reliance and equitable estoppel are the same. *Miller* at *3.

*Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 252 (5th Cir. 2002).

Here, given that the doctrine of detrimental reliance is not favored by Louisiana law, and that all such claims are to be examined strictly and carefully, the undersigned is compelled to hold that it was not reasonable for FNB to rely on the absence of the tax lien being disclosed in the commitment letter when it had actual knowledge that the tax lien had recently existed, especially where the means to easily check were readily available to FNB.

Further, the commitment from Lawyers Title provides that "If the proposed Insured has or acquires *actual knowledge* of any defect, *lien*, encumbrance or adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, *and shall fail to disclose such knowledge to the Company in writing*, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge." (emphasis added). [rec. doc. 36, Exhibit J, p. 1].

Here, FNB admitted that it was on notice that the Burtons had a federal tax lien filed against them as of the date of the first credit report, July 17, 2007. [rec. doc. 36, Exhibit C, pp. 40-41; Exhibit M, responses to Interrogatories 9 and 16]. Lawyers Title asserts that it was prejudiced by FNB's failure to disclose the lien, because had Lawyers Title known about the lien, it could have assessed the risk presented and either refused to write the policy or charge a premium reflective of the risk presented by the lien. Additionally, Lawyers Title states that it was forced to defend this litigation, incurring fees and costs as a result. The undersigned

agrees.  Accordingly, I find that FNB's claim for detrimental reliance must fail.

## *Conclusion*

Based on the foregoing reasons, the undersigned recommends that the Motion for Summary Judgment be **GRANTED,** and that plaintiff's action be **DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT ON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

August 12, 2010, Lafayette, Louisiana.

-13-

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE